J-A06026-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.N., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.N., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1155 WDA 2025 |

Appeal from the Order Entered September 9, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000077-2024

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                   **FILED: March 27, 2026**

M.N. (Mother) appeals from the order granting the petition filed by the Allegheny County Office of Children, Youth and Families (CYF), and involuntarily terminating Mother's parental rights to her daughter, O.N. (Child), born in May 2022.[1]  After careful review, we affirm.

The orphans' court described how the family came to CYF's attention, and CYF's subsequent involvement with the family:

> Child's family was identified by [CYF in] October 2020.  CYF's involvement at that time was [based on] a referral [alleging the] medical neglect of Child's elder [brother], J.R.; intimate partner

---

[1] At the termination of parental rights (TPR) hearing, the parties stipulated that Mother identified R.R. (Father) as Child's biological father.  N.T., 7/31/25, at 26.  In addition to terminating Mother's parental rights, the orphans' court involuntarily terminated the parental rights of Father and unknown father.  ***See id.*** (the parties stipulating that, "as [Father] is not on [Child's] birth certificate, she has an unknown father.").  Father and unknown father are not parties to the instant appeal.

violence ("IPV"); and substance abuse. CYF accepted service of the family on December 8, 2020, and [] closed [service] on April 21, 2021, because the family did not engage with [CYF].

A second referral occurred in October 2022 following a report that Child missed medical appointments and had not been seen [by medical professionals] since she was 4 weeks old. CYF [filed] a dependency petition to compel [the] family's compliance. Mother was found to have substance abuse issues, and both parents were ordered to cooperate with KidsVoice, sign releases, and bring Child and … J.R. [(collectively, Children)] up to date medically. [The dependency proceedings were continued pending Mother and Father's compliance.]

The case did not close out because of an incident that occurred at a motel room [(the motel)] in Monroeville, P[ennsylvania], on December 23, 2023. [On that date, Children] were removed from the care of [Mother and Father], and placed into emergency protective custody, after Monroeville Police responded to the [motel] for a noise complaint. Upon arrival, police officers found [the family was] living in the motel []. A subsequent search of the [motel] revealed narcotics and drug paraphernalia. Father admitted to using heroin, while Mother denied the same to police. [Mother and Father] were charged with [endangering the welfare of children] and possession of controlled substances and paraphernalia.[2]

[Children] were placed, [through] Auberle [Family Healing Center (Auberle)], [into the] care of H. and F.P.; however, [Children] were ultimately placed, [through] A Second Chance foster home, [into the care] of B.J.L. and D.L., who are [Children's] maternal grandparents[ (Grandparents)].[3]

_____

[2] 18 Pa.C.S.A. § 4304(a)(1); 35 P.S. § 780-113(a)(16), (32). On August 9, 2023, Mother pled guilty to all offenses, and, that same date, the trial court imposed an aggregate sentence of two years' probation. *See* CYF Exhibit 10 (Mother's certified criminal records).

[3] Grandparents are pre-adoptive resources for Child. At the TPR hearing, licensed psychologist Gregory A. Lobb, Ph.D. (Dr. Lobb), testified that Mother and Father consented to Grandparents' adoption of J.R. N.T., 9/8/25, at 19. The record does not disclose when Mother and Father consented to J.R.'s proposed adoption, or the status of any adoption proceedings involving J.R.

Mother admitted to [engaging in] IPV with Father. … [Child] was not up to date with medical care. Child Protective Services ("CPS") and General Protective Services ("GPS") [reports] were [generated] as a result of a Child[L]ine investigation. [The] CPS [report] indicated a reasonable likelihood of bodily harm [to Children from] both [Mother and Father]. [The] GPS [report] rated, as valid, [allegations of Mother's and Father's illegal controlled] substance use ….

On April 12, 2023, [following a hearing, the orphans' court] adjudicated [Children] dependent. Mother [was] ordered to [submit to] random [drug] screens, [engage in] IPV counseling, [and] attend and participate in the recommended level of care.

Orphans' Court Opinion, 10/9/25, at 3-5 (punctuation modified; two footnotes added; footnotes in original omitted).

The orphans' court conducted permanency review hearings on September 6, 2023; February 7, October 2, and November 20, 2024; and May 7, 2025. At each hearing, the orphans' court found Child's placement to be necessary and appropriate. The orphans' court consistently noted, in its permanency review orders, Mother's failure to comply with various of its directives. *See*, *e.g.*, CYF Exhibit 7 (Court orders), Permanency Review Order, 2/7/24, at 2 (the orphans' court finding that Mother had failed to engage in drug and alcohol treatment, and tested positive for fentanyl on January 10, 2024); *id.*, Permanency Review Order, 10/2/24, at 3 (the orphans' court finding that Mother was still abusing illicit "drugs into her 8th

month of pregnancy with [her third child, P.R.,[4]] and was not in compliance with her reunification goals." (footnote added)).

The orphans' court explained that on May 7, 2025,

[a]t the final [permanency review hearing], Mother was arrested for an outstanding warrant for retail theft. Mother had active criminal cases at that time in the municipalities of Monroeville and Oakmont[, Pennsylvania,] for theft and public intoxication. Mother denied being intoxicated [at the May permanency review hearing]. Mother testified at the hearing that she did not have any substances [in her system] other than her prescribed methadone. Mother admitted, however, that she had a bottle of Tito's vodka in her purse ….

Orphans' Court Opinion, 10/9/25, at 12 (footnotes omitted).

In the interim, on April 19, 2024, CYF filed its TPR petition. Therein, CYF alleged that Mother "is unable to parent [Child,] as she has failed to comply with, or make sufficient progress on, the goals/outcomes established for her by []CYF or in court orders." TPR Petition, 4/19/24, ¶ 9.

The matter proceeded to a TPR hearing on July 31 and September 8, 2025. Mother appeared, represented by court-appointed counsel. Child, approximately three years old at the time, did not appear, but was represented by a guardian *ad litem* (GAL). Child's GAL indicated there was no

---

[4] Mother gave birth to a daughter, P.R., in May 2024. N.T., 7/31/25, at 99. At the TPR hearing, the parties stipulated that P.R. was placed into emergency protective custody shortly after her birth, and was adjudicated dependent on October 1, 2024. *Id.* at 27, 28. The status of P.R.'s dependency case at the time of the TPR hearing is not apparent from the record; however, as of May 7, 2025, P.R. was placed in a foster home separate from Children. *See* Permanency Review Order, 5/7/25, at 4.

conflict between Child's best and legal interests. *See* N.T., 7/31/25, at 4; *see also* N.T., 9/8/25, at 69 (the GAL indicating Child was "unable to provide an articulate preference regarding this TPR proceeding today. It is in her legal and best interests" that Mother's parental rights be terminated); Order, 10/2/24, at 1 (the orphans' court finding that "no conflict exists" in the GAL's representation of Child); *see also Interest of H.H.N.*, 296 A.3d 1258, 1264 (Pa. Super. 2023) ("[W]here there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."); *In re T.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests[.]").

At the hearing, CYF presented the testimony of numerous witnesses, including CYF caseworker James Kloshen (Mr. Kloshen); Allegheny County Health Department lab technician Tarraca Jackson (Ms. Jackson); Tadiso Incorporated (Tadiso) drug and alcohol abuse counselor Cassandra Aguglia (Ms. Aguglia); Sharon Klapec, M.D. (Dr. Klapec); CYF caseworker supervisor Rhonda Nixon (Ms. Nixon); Pennsylvania Organization for Women in Early Recovery (POWER) program director Rachel Wagner (Ms. Wagner); and Dr. Lobb. Mother presented the testimony of, *inter alia*, Allegheny Family Network (AFN) certified recovery specialist Heather Spencer (Ms. Spencer). Mother elected not to testify.

Mr. Kloshen testified that Mother's family plan established the following goals: (1) maintain sobriety, (2) attend parenting classes, (3) secure appropriate housing, and (4) address IPV concerns. N.T., 7/31/25, at 95. Mr. Kloshen explained that Mother's substance abuse was concerning, because

> [t]here were criminal charges that [Mother] had [incurred throughout] the life of the [dependency] case that were associated with [substance ab]use. [Mother] had [] positive tests for fentanyl. [Mother] was positive [for fentanyl] at the birth of her other daughter, P[.R.], and then when [Child] was … brought into [CYF's] care, [Child] had tested positive for [controlled] substances.

*Id.*; *see also id.* (Mr. Kloshen testifying that J.R. had reported observing Mother consuming illegal drugs).

Mr. Kloshen testified that, on an unspecified date prior to the filing of CYF's TPR petition, Mother completed a drug and alcohol treatment program through UPMC's Western Psychiatric Hospital. *Id.* at 99-100. Mr. Kloshen testified that in October 2024—after CYF filed its TPR petition—Mother successfully completed an inpatient drug and alcohol program through Auberle. *Id.* at 97. *But see id.* (Mr. Kloshen testifying that Mother did not attend recommended "after care for her mental health" at JADE Wellness Center); *see also id.* at 159 (Mr. Kloshen testifying that Mother told him that "she wanted to just stick with everything with Tadiso, … because it was just easier for her that way."). Mr. Kloshen testified that Mother had not completed any additional drug and alcohol treatment programs, despite Mother's continued substance abuse. *Id.* at 98; *see also id.* at 100 (Mr. Kloshen

testifying that Mother admitted to consuming alcohol following her discharge from inpatient treatment).

Concerning IPV, Mr. Kloshen testified that on January 10, 2024, Mother completed an online domestic violence course through the North American Learning Institute.  *Id.* at 105.  Mr. Kloshen explained that, after CYF filed its TPR petition, Mother was the victim of IPV perpetrated by a former paramour, and Mr. Kloshen was unaware of whether Mother participated in any additional IPV programming.  *Id.* at 106.

Mr. Kloshen testified that the purpose of Mother's parenting goal was to improve her parenting skills, generally, and to assist Mother in understanding the effects of "parental substance abuse."  *Id.*  Mr. Kloshen testified that CYF referred Mother to Arsenal Family and Children's Center (Arsenal) for parenting classes.  *Id.*  According to Mr. Kloshen, Mother appeared at Arsenal for an initial intake on April 5, 2023, as well as two additional sessions, but failed to complete Arsenal's program.  *Id.*

Mr. Kloshen testified that Mother exercised unsupervised visitation with Child from October 2024 (following her discharge from Auberle) to May 2025. *Id.* at 108; *see also* Permanency Review Order, 5/7/25, at 3 (the orphans' court ordering Mother's visits with Child to be supervised following "Mother['s] arrest[] at today's hearing for an active retail theft warrant.").  Mr. Kloshen opined that Mother has not "developed an understanding about how substance

abuse [a]ffects her parenting[,]" as evidenced by Mother's "various charges for public intox[ication]." ***Id.***; ***see also*** CYF Exhibit 10.

The orphans' court summarized, as follows, Mr. Kloshen's testimony regarding Mother's housing throughout CYF's involvement with the family:

> Historically, Mother struggled with housing. … [The family resided at the motel] in Monroeville[] until their eviction. N.T., 7/31/25, at 111. Mother then moved into an apartment in the Highland Park section of Pittsburgh. Mother was eventually evicted from that apartment as well. ***Id.*** Mother and Father lived together at a third residence that caught fire. The Red Cross assisted Mother and Father with shelter at the Extended Stay in Monroeville[.] ***Id.***
>
> Mother was evicted for trespassing at Extended Stay and relocated to Roadway Inn[ in Monroeville]. Mother then moved into a town home in Plum, P[ennsylvania,] with an unknown male friend. Mother then moved again to an apartment in the South Side section of Pittsburgh …. ***Id.***

Orphans' Court Opinion, 10/9/25, at 10-11 (record citations in footnotes modified and moved to body).

Ms. Jackson testified that Mother attended 20 out of 83 random drug screens requested by CYF. N.T., 7/31/25, at 34, 38-39. Of those 20 drug screens, Ms. Jackson testified, Mother tested positive for fentanyl and/or its metabolite, norfentanyl, on 10 occasions. ***Id.*** at 35-36; ***see also id.*** at 36 (Ms. Jackson testifying that Mother had tested positive for norfentanyl as recently as June 10, 2025).[5]

_____

[5] At the TPR hearing, Mr. Kloshen testified that, on June 14, 2025, Mother provided him with a "doctor's note" indicating Mother was administered fentanyl as part of a medical procedure. N.T., 7/31/25, at 103. Mr. Kloshen
*(Footnote Continued Next Page)*

Ms. Aguglia testified that she has been Mother's drug and alcohol abuse counselor since June 2, 2025, and that Mother had been a part of Tadiso's methadone program since June 27, 2024. *Id.* at 45. Ms. Aguglia explained that Tadiso requires random drug screens on a monthly basis. *Id.* at 48. According to Ms. Aguglia, on December 4, 2024, Mother tested positive for cocaine, and on May 23, 2025, Mother tested positive for benzodiazepine. *Id.* at 49.

Dr. Klapec testified that she was working at Forbes Regional Hospital's (the hospital) emergency room on March 31, 2025. N.T., 7/31/25, at 18-19. Dr. Klapec testified that, on that date, Mother was transported by ambulance to the hospital, because Mother "was reportedly choking at a restaurant." *Id.* at 19; *see also id.* at 20 (Dr. Klapec testifying Mother advised her that she "choked on a piece of steak[,]" and "[b]ystanders at the restaurant [] had called 911 for her."). Dr. Klapec testified that Mother told her that she "had a couple of alcoholic beverages before leaving her house[,] and then had a couple more alcoholic beverages with dinner." *Id.* at 20. According to Dr. Klapec, paramedics "reported … that by the time they arrived [at the restaurant, Mother] was no longer choking; however, [Mother] did seem intoxicated, with slurred speech and an unsteady gait …." *Id.* at 20-21 (punctuation modified); *see also id.* at 21 (Dr. Klapec testifying that Mother's

---

stated his belief, however, that Mother was not prescribed fentanyl following her procedure. *Id.* at 159.

"presentation" was "most consistent with alcohol intoxication."). *But see id.* at 102 (Mr. Kloshen testifying that Mother "adamantly denied being intoxicated" at the hospital).

Ms. Nixon testified that approximately two months prior to the TPR hearing, on May 21, 2025, Mother reported to a CYF facility for a supervised visit with Child. *Id.* at 168. Ms. Nixon testified that she terminated Mother's visit because Mother "appear[ed] to be under the influence of something." *Id.* at 169. According to Ms. Nixon, Mother stated that her methadone "dose may have been high." *Id.* Ms. Nixon advised Mother that she would need to report for a drug screen that day, and offered Mother transportation to the Allegheny Health Department. *Id.* Ms. Nixon testified that Mother declined this offer and never appeared for the drug screen. *Id.*

Ms. Wagner testified as POWER's program director of intake and outpatient services. *Id.* at 58. Ms. Wagner testified that CYF referred Mother to POWER on February 23, 2023; and February 7, April 8, and May 14, 2024. *Id.* at 60. Ms. Wagner testified that, approximately two weeks prior to the TPR hearing, Mother "presented [at POWER's facility] for a walk-in assessment." *Id.* Ms. Wagner testified that Mother refused to sign a consent permitting Tadiso to share treatment information with POWER. *Id.* at 66. Ms. Wagner testified that Mother had not disclosed that she had admitted to Dr. Klapec that she had consumed alcoholic beverages prior to Mother's admission to the hospital. *Id.* Ms. Wagner further testified that Mother never informed

POWER about her positive test results for fentanyl. *Id.* at 67; *see also id.* (Ms. Wagner testifying that, if disclosed, Mother's alcohol and fentanyl use would have been taken into consideration in POWER's treatment recommendations).

Finally, Dr. Lobb testified as "an expert in the area of child and forensic psychology[.]" N.T., 9/8/25, at 7. Dr. Lobb confirmed that he authored three reports, dated November 17, 2024; March 4, 2025; and August 8, 2025, respectively. *Id.* at 7-8. The orphans' court summarized Dr. Lobb's testimony and clinical findings as they related to Child's bond with Mother, and Child's bond with Grandparents, as follows:

> Although Mother and Child appeared to have a bond, Mother and Child were evaluated [alongside J.R.] *See* CYF Exhibit 15 (Psychological evaluations). … [I]t was clear that J.R. harbored deep resentment towards Mother due to Mother's past behavior. *Id.* J.R. was protective [of Child]. *Id.* Dr. Lobb testified … that it is beneficial for [Child] to also have a relationship with [J.R.] N.T., 9/8/25, at 20. ….
>
> … Dr. Lobb [conducted] an interactional [evaluation] with [Grandparents] and [Children]. *See* CYF Exhibit 15. Based on the interactional[ evaluation], Dr. Lobb opined that Children have a secure attachment with [] Grandparents[] that is the result of [] Grandparents being fully attuned to [] Children. *Id.*
>
> [] Grandparents have been [Child's] primary caretakers for more than two years. *Id.* Dr. Lobb opined that Grandparents do a "wonderful job" parenting[ Child]. *Id.* Dr. Lobb observed Grandparents to be engaged, sensitive[,] and responsive to [Children's] needs. *Id.* [Dr. Lobb] further observed that Grandparents cause Child to feel safe and secure[,] and are able to communicate with [] Children that they are there for them when needed. *Id.*

Further, based on the interactional [evaluation] between [] Grandparent[s] and [Child], it was clear to Dr. Lobb that [Child] views [Grandparents] as her psychological parents[; Child] is very comfortable with [Grandparents;] and [Grandparents] are [Child's] "go-to" adults in her life. *Id.*

Orphans' Court Opinion, 10/9/25, at 34-36 (record citations in footnotes modified and moved to body; some capitalization modified); *see also* N.T., 9/8/25, at 21 (Dr. Lobb recommending termination of Mother's parental rights to Child).

Ms. Spencer testified on Mother's behalf, explaining that she has worked as Mother's recovery specialist since January 2024. N.T., 9/8/25, at 44. Ms. Spencer described the support she provided to Mother.

At first[,] … we did more just engagement with my lived experiences, you know, building rapport because I have been through similar situations, and then we transitioned into going out to meetings, getting healthy support from like N[arcotics] A[nonymous], A[lcoholics] A[nonymous] meetings and recovery, and then also [AFN] has a drug and alcohol group once a month. [Mother] attended that every time.

*Id.* at 45.

Ms. Spencer testified that Mother "had completed all her goals" set by AFN, and AFN was preparing to "clos[e] out" Mother's case. *Id.* at 44-45. ***But see id.*** at 55 (Ms. Spencer conceding that AFN "cannot close out until CYF is finished… or if they pulled a referral."). Ms. Spencer opined that Mother "has done leaps and bounds," and "has done very well" in her recovery from substance abuse. *Id.* at 47; ***see also id.*** at 50 (when asked whether "a person with an opioid addiction [should] drink alcohol," Ms. Spencer testifying,

"I have met people that could socially drink that were in recovery from heroin. So it really all depends on how you look at it.").

After the close of evidence, Child's GAL recommended that the orphans' court terminate Mother's parental rights, opining as follows:

> As we heard from Dr. Lobb, regardless of the bond that may exist between [Child] and [Mother], due to the ongoing concerns for [Child], Dr. Lobb believes that [Mother] would not be able to provide the safety and security that would be needed at this time. ….
>
> In addition, [Child] has been with [G]randparents for 3[0] months at this point. … [B]eing with [Grandparents] for that long[,] it is clear that [Child] needs [Grandparents] as her psychological parents[,] as they are the ones that have been meeting all of [Child's] needs.

*Id.* at 74.

The orphans' court heard arguments from counsel and took the matter under advisement. On September 9, 2025, the orphans' court entered an order terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). Mother filed a timely notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement. On October 9, 2025, the orphans' court filed a Rule 1925 opinion.

Mother raises the following issues:

> 1. Did the [orphans'] court abuse its discretion and/or err as a matter of law by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] §[ ]2511(a)(2), (5), and (8)?
>
> 2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's

parental rights would best serve the needs and welfare of [Child] pursuant to 23 Pa.C.S.[A.] §[ ]2511(b)?

Mother's Brief at 8.

We review the termination of parental rights for an abuse of discretion. ***See Interest of N.A.S.***, 338 A.3d 191, 196 (Pa. Super. 2025). This standard of review requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in ***In re: R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***Interest of K.T.***, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting ***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012)); ***see also In re Adoption of C.P.D.***, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses

and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024) (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*)). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

In her first issue, concerning Section 2511(a)(8), Mother argues that the "record failed to provide sufficient evidence to make a finding" that "the

conditions which led to the removal or placement [of Child] … continue to exist." Mother's Brief at 19 (quoting 23 Pa.C.S.A. § 2511(a)(8)). According to Mother,

> [t]he conditions that initially led to [] Child's removal included inadequate housing[,] which has now been addressed. Mother had participated in bringing Child medically up to date after [Child's] removal[ from Mother's care]. Mother has continued to address her criminal matters and sobriety concerns, and she could car[e] for [] Child with additional services.

*Id.* at 20; *see also id.* (Mother arguing the evidence demonstrated that "Child has a strong and clear bond with [] Mother[,] which [] should be preserved for the benefit of [] Child.").

Instantly, the orphans' court focused its analysis on Section 2511(a)(8), which provides as follows:

> **(a) General rule--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

To satisfy Section 2511(a)(8), the petitioner must prove that

> (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would

- 16 -

best serve the needs and welfare of the child. Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. Rather, our inquiry is focused upon whether the at-issue conditions have been remedied such that reunification of parent and child is **imminent** at the time of the hearing.

*In re E.J.C.*, 335 A.3d 1222, 1230-31 (Pa. Super. 2025) (citations and quotation marks omitted; emphasis in original).[6]

Pursuant to Section 2511(a)(8), "when one year has elapsed from the children's removal, the General Assembly has relieved the petitioner from the burden of proving that the parent is incapable of, or unwilling to, remedy the conditions, circumstances, or conduct that led to the children's removal." *In re Adoption of G.W.*, 342 A.3d 68, 87 (Pa. Super. 2025) (*en banc*); *see also id.* (observing that, in a Section 2511(a)(8) analysis, "[t]he court's inquiry is no longer concerned with whether the parent is capable of change, or whether the parent has tried to change, but seeks only to discern if the parent has, in fact, changed."). We have specifically observed that "a parent's progress toward remedying the conditions [necessitating her child's placement] is insufficient, as a matter of law, to warrant a finding in favor of the parent under the second prong of [Section 2511](a)(8)." *Id.* (citing *In re R.J.S.*, 901 A.2d 502, 512 (Pa. Super. 2006)). Moreover, Section 2511(a)(8) does

---

[6] Mother does not dispute that Child has been removed from Mother's care for at least 12 months. *See generally* Mother's Brief.

not "require an evaluation of the availability or efficacy of [a child protective services agency's] services." *Id.* at 88 (citation omitted).

Although Section 2511(a)(8)'s first two elements focus on the conduct of the parent, its third element centers on the needs of the child, an area of inquiry generally reserved for the court's Section 2511(b) analysis. *See* 42 Pa.C.S.A. § 2511(a)(8) (requiring the petitioner to prove "termination of parental rights would best serve the needs and welfare of the child"); *id.* § 2511(b) (requiring the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child"). We have recently observed that, even though Section 2511(a)(8) and (b) do not share identical language, "our current precedent interprets the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence." *G.W.*, 342 A.3d at 89 n.20 (citing *C.L.G.*, 956 A.2d at 1008-09, and *Matter of Adoption of M.A.B.*, 166 A.3d 434, 448 (Pa. Super. 2017)).

Instantly, after thoroughly summarizing the above-described TPR hearing testimony, the orphans' court concluded CYF met its burden of proving that termination of Mother's parental rights was warranted pursuant to Section 2511(a)(8). Orphans' Court Opinion, 10/9/25, at 31.

Concerning Mother's sobriety goal, the orphans' court emphasized that Mother failed to appear for more than forty requested drug screens. *Id.* at 24. The orphans' court noted that Mother tested positive for fentanyl and/or

norfentanyl at ten of the twenty drug screens she attended, with the most recent positive drug screen occurring approximately one month prior to the TPR hearing. *Id.*; *see also id.* at 25 (the orphans' court highlighting Mother's positive drug screens, administered by Tadiso, for cocaine on December 4, 2024, and benzodiazepine on May 23, 2025).

The orphans' court explained that it did not find Ms. Spencer's testimony concerning Mother's sobriety credible, observing that Ms. Spencer "was unsure of Mother's clean date[,]" and "unsure if Mother entered into JADE Wellness" Center for recommended aftercare. *Id.* at 26; *see also id.* at 27 (the orphans' court finding that "Ms. Spencer minimized Mother's conduct of alcohol usage[,]" and observing that Ms. Spencer "was not able to articulate clear guidelines on what constitutes success for reaching a closed-out status").

Regarding Mother's requirement to address IPV concerns, the orphans' court stated that, although Mother

> was referred to the Women's Center and Shelter on December 29, 2023[,] for counseling related to [] victims of IPV[,] … [she only] attended one (1) session. Instead, Mother completed an online course in the area of domestic violence at the North American Learning Institute on January 10, 2024. The [orphans'] court is unfamiliar with this company and its program. There was no evidence presented [as to] whether this online course was a curriculum for batterers or victims. The court does not accept this as a substitute. Further, following the completion of the online course, Mother reported another domestic violence incident. … This incident occurred approximately five (5) months after the TPR petition was filed. Mother never sought out any further IPV treatment to address this goal following this incident. A completion certificate of an online course does not satisfy the court that any tools that may have been taught have been utilized.

*Id.* at 27-28.

The orphans' court additionally found that Mother failed to meet her parenting goals. *Id.* at 29. The orphans' court noted Mother did not complete parenting classes at Arsenal, and, at the time of the TPR hearing, "Mother's visits [with Child had] reverted to supervised" "due to Mother's criminal charges and public intoxication[.]" *Id.*; *see also id.* at 30 (the orphans' court observing Mother "appear[ed] for a [supervised] visit [with Child] under the influence[ of drugs/alcohol]").

Finally, regarding her housing goal, the orphans' court found that "Mother never secured or maintained consistent housing throughout the lifetime of the case." *Id.* The orphans' court noted that, "[a]lthough Mother currently is being provided an apartment, she has not been financially responsible as of the date of the [TPR] hearing to demonstrate compliance." *Id.*

> The orphans' court ultimately concluded that
>
> CYF has provided Mother with all necessary services to remedy the conditions that led to [] Child's removal[.] … Mother chose not to take advantage of those supports and services; rather[,] Mother manipulated many of her [service] providers with incomplete or inaccurate information. … [I]t is clear that the conditions that led to [Child's] removal have not been remedied and[,] therefore[,] reunification is not imminent.

*Id.* at 31; *see also id.* at 40 (the orphans' court concluding that termination of Mother's parental rights is in Child's best interests).

The orphans' court's factual findings are supported by the record, and we agree with its legal conclusion. *See K.T.*, 324 A.3d at 56. Upon review, the record belies Mother's claim that the TPR hearing record supplied insufficient evidence that the conditions necessitating Child's placement continued to exist. As aptly summarized by the orphans' court above, CYF presented substantial evidence that Mother failed to meet each of the goals set for her by CYF and the orphans' court. The orphans' court acted within its discretion when it credited that evidence. *See L.C.J.W*, 311 A.3d at 48 ("It is the province of the orphans' court to assess credibility and resolve any conflicts in the evidence, and in doing so it is free to believe all, part, or none of the evidence presented." (citation and quotation marks omitted)).

Accordingly, we discern no abuse of the orphans' court's discretion in finding that CYF proved, by clear and convincing evidence, that the conditions necessitating Child's placement continued to exist at the time of the TPR hearing, and (discussed further *infra*) that termination of Mother's parental rights serves Child's best interests. Mother's first issue merits no relief.[7]

Mother next claims that insufficient evidence supported the orphans' court's determination that termination of Mother's parental rights best serves the needs and welfare of Child. Mother's Brief at 20. Mother argues that

---

[7] As we have concluded that the orphans' court did not err in finding sufficient evidence supported termination pursuant to Section 2511(a)(8), we need not consider Mother's claims concerning Section 2511(a)(2) or (5). *See Int. of M.E.*, 283 A.3d at 830.

"[t]he record clearly established that [] Child and Mother share an important and meaningful bond." *Id.* at 21. Mother represents that she "has an extremely difficult prior relationship with [Grandparents,] and there is a high probability that [] Child will never see [] Mother again following termination." *Id.* at 22. Additionally, Mother claims, "Child also has the potential for a sibling relationship with … P.R.[,] which could [] be affected by termination." *Id.*

When the trial court finds grounds for termination under Section 2511(a), it must separately consider a child's needs and welfare:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

"Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citation omitted). Courts must also "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* at 1104 (citation omitted). However,

"the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113.

> [B]ond, plus permanency, stability and all "intangible" factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of "primary" importance in the Section 2511(b) analysis. … [A]lthough the parental bond is a major aspect of the Section 2511(b) analysis, it is nonetheless only one of many factors to be considered by the court, in addition to the intangibles such as love, comfort, security, and stability. Moreover, the court must consider whether, in the context of all these factors, the parental bond is necessary and beneficial to the child.

*Id.* at 1109 (citations and some quotation marks omitted); *see also In re T.S.M.*, 71 A.3d 251, 269 (Pa. 2013) (stating that "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly.").

> We have further observed that
>
> when possible, the preservation of the family is the desired outcome in custody matters. However, "[t]he goal of preserving the family unit cannot be elevated above all other factors when considering the best interests of the children, but must be weighed in conjunction with other factors." *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa. Super. 2011) (citation omitted).

*In re K.D.*, 144 A.3d 145, 153 (Pa. Super. 2016).

Instantly, in conducting its Section 2511(b) analysis, the orphans' court credited Dr. Lobb's above-summarized clinical evaluation regarding Child's respective bonds with Mother and Grandparents. *See* Orphans' Court Opinion, 10/9/25, at 34-36. The orphans' court explained that, in finding sufficient

evidence supported termination of Mother's parental rights pursuant to

Section 2511(b),

> the court gave primary consideration to the developmental, physical, and emotional needs and welfare of [] Child. The court examined whether there was an emotional bond between Mother and Child as part of its best-interest analysis, but that is only one of many factors the court considered in making its determination.
>
> The court also examined the safety needs of [] Child, as well as other intangibles that [] Child has with [Grandparents], such as love, comfort, security, and stability. The court's determination included the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on [] Child. Although evidence of a bond [between Mother and Child] exists, the bond is outweighed by Mother's inability to remedy the causes of Child's placement, and by Child's need for permanence and stability. The court concluded that [Child's] trust and emotional support rests with [Grandparents]. Focusing on the perspective of [] Child, [] Child enjoys a special relationship with [Grandparents].
>
> … The court relied upon [Dr. Lobb's] expert opinion, and found that Child will not suffer extreme and emotional consequences by severing the bond between [] Child and Mother. The court also considered whether termination of [Mother's] parental rights would destroy something positive. The court finds that the termination is in the best interest of Child because Mother has proven unwilling and unable to parent.

*Id.* at 38-39 (punctuation modified).

We agree with the reasoning and conclusion of the orphans' court, as it is supported by the record and free of legal error. *See K.T.*, 324 A.3d at 56. The orphans' court recognized a bond between Mother and Child, but appropriately exercised its discretion in determining Child's bond with Grandparents, as well as Child's need for (and right to) permanency,

outweighed that bond. ***See In the Int. of K.T.***, 296 A.3d at 1113.[8] Accordingly, Mother's second issue entitles her to no relief, and we affirm the order terminating Mother's parental rights.

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 03/27/2026

---

[8] Regarding Mother's speculative claim that termination of her parental rights to Child may impact Child's relationship with P.R., we note there is nothing in the record to suggest that Grandparents will prevent Child's contact with P.R.